IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI`I

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>EMIL WOLFGRAMM, JR., LATUNIUA POHAHAU, and SIONE LAULEA,<br><br>　　　　Defendants. | CR NO. 13-00877 DKW<br><br>ORDER DENYING DEFENDANT WOLFGRAMM'S MOTION TO SUPPRESS EVIDENCE |

## ORDER DENYING DEFENDANT WOLFGRAMM'S MOTION TO SUPPRESS EVIDENCE

Defendants Emil Wolfgramm, Jr., Latuniua Pohahau, and Sione Laulea are charged, in separate counts, with: conspiring to knowingly and intentionally distribute and possess, with the intent to distribute, 50 grams or more of methamphetamine (all three defendants charged), knowingly and intentionally possessing with the intent to distribute approximately 4,588 grams of methamphetamine (Wolfgramm and Pohahau) on August 15, 2013, and knowingly and intentionally possessing, with the intent to distribute, approximately 4,465 grams of methamphetamine (all three defendants) on September 4, 2013. Wolfgramm moves to suppress all evidence obtained from his vehicle at the time

of a September 4, 2013 traffic stop, search and arrest. Wolfgramm contends that the warrantless search of his vehicle and its contents violates the Fourth Amendment. Pohahau and Laulea, passengers in the vehicle at the time of the stop, search, and arrest, join in the motion.

Following briefing and an evidentiary hearing, the Court upholds the validity of the search, finding no constitutional violation. Accordingly, the motion to suppress is DENIED.

## BACKGROUND

Wolfgramm and Pohahau were the subjects of a multi-agency investigation led by United States Drug Enforcement Administration ("DEA") Special Agent Matthew Rumschlag ("SA Rumschlag"). Task force officers were assigned to conduct surveillance of both Wolfgramm's home in Mililani and Pohahau's home in Ewa Beach. In August 2013, through a confidential source ("CS"), the government conducted a controlled purchase of approximately ten pounds of methamphetamine from Wolfgramm and Pohahau. September 19, 2014 Hearing Transcript ("Tr.") at 8–10. SA Rumschlag described the August 2013 controlled purchase as follows:

> The confidential source notified me that Mr. Wolfgramm wanted --
> Mr. Wolfgramm had a friend who wanted to have that confidential
> source distribute crystal meth or narcotics for -- for Mr. Wolfgramm's
> friend.
> So I don't remember the exact date, but on – on one of the early
> morning -- during the morning hours of August of 2013, there was a

> meeting with -- the confidential source met with Mr. Wolfgramm and
> Mr. Pohahau in the gold-colored Honda Pilot SUV, which was also
> observed -- I believe that was the same vehicle that was observed in
> September. The confidential source met up with Mr. Pohahau and
> Mr. Wolfgramm. Mr. Pohahau put a backpack inside the confidential
> source's vehicle.
> After the meeting took place, we followed the confidential source to a
> neutral location where I obtained the backpack, and there was
> suspected crystal methamphetamine in there, approximately 10
> pounds, which was ultimately sent to the -- the DEA lab for testing.

Tr. at 23–24.

On September 3, 2013, the CS met with Wolfgramm, Pohahau, and a then-unidentified third individual. The purpose of the meeting was for the CS to arrange for the purchase of another ten pounds of methamphetamine. However, the CS declined to take delivery of the methamphetamine on that day and instead communicated that he would contact Wolfgramm and Pohahau the next day. Tr. at 14–15.

On the morning of September 4, 2013, SA Rumschlag accompanied the CS, as the CS placed recorded telephone calls to Wolfgramm and Pohahau. The CS first spoke to Pohahau, who indicated that Wolfgramm was in possession of the methamphetamine they had discussed the previous day. The CS then telephoned Wolfgramm. The CS agreed to meet Wolfgramm and Pohahau at Wahoo's Fish Tacos on Ward Avenue in Honolulu later that day to conduct their business. That information was communicated by SA Rumschlag to all surveillance task force officers. Tr. at 11–13, 15–16.

3

Law enforcement surveillance then observed and followed Pohahau as he drove from his Ewa Beach home in possession of a backpack. Surveillance observed Pohahau arriving at Wolfgramm's home in Mililani and entering with a backpack. After an undetermined period of time, surveillance then observed Wolfgramm, Pohahau, and a third individual (later identified as Laulea) exit Wolfgramm's home and drive off together in a gold-colored SUV. Pohahau was again observed carrying a backpack upon exiting Wolfgramm's residence and entering the SUV. Tr. at 19, 22–23.

Honolulu Police Department ("HPD") Officer Alvin Vierra and his partner, HPD Officer Ryan Miyatake, were assigned as DEA task force officers under SA Rumschlag as part of the investigation. On the morning of September 4, Officers Vierra and Miyatake were briefed on the controlled drug transaction that was expected to occur that day between the CS, Wolfgramm, and Pohahau. Once Wolfgramm and Pohahau were en route to meet the CS with the methamphetamine suspected to be in their possession, the task force plan called for Officers Vierra and Miyatake to follow the vehicle and conduct a traffic stop if the officers observed a traffic violation. Following the recorded telephone calls that morning between the CS, Wolfgramm, and Pohahau, Officers Vierra and Miyatake were advised that the defendants' vehicle would be headed in the direction of Ward

4

Avenue in Honolulu where the methamphetamine transaction with the CS was scheduled to occur. Tr. at 68–71, 101–102.

More specifically, Officers Vierra and Miyatake were notified that law enforcement surveillance observed defendants leaving Wolfgramm's residence in a gold-colored SUV, that a black backpack accompanied them into the vehicle, and that the backpack was suspected to contain the ten pounds of methamphetamine that was to be delivered to the CS at the meeting point on Ward Avenue. Consistent with the task force plan, Officers Vierra and Miyatake located the gold-colored SUV and followed it on the freeway from Mililani in the direction of Ward Avenue. Officer Vierra testified that they caught up with the vehicle in the area of the Liliha H-1 onramp in Honolulu and determined that the SUV was moving in excess of the speed limit. For safety reasons, however, Officer Vierra decided not to make the traffic stop on the freeway. Tr. at 71–73, 101–102.

Officers Vierra and Miyatake continued to follow the SUV as it exited the H-1 freeway onto Kinau Street. Shortly after the SUV turned right from Kinau Street onto Ward Avenue, the officers stopped the vehicle. Officer Vierra explained to Wolfgramm, the driver of the SUV, that he had exceeded the speed limit. The officers then asked Wolfgramm, Pohahau, and Laulea to exit the vehicle, where they were handcuffed and asked to sit under the overhang of an apartment building adjacent to Ward Avenue. Tr. at 73–77.

5

The officers called in a canine unit (consistent with the task force plan agreed to earlier that morning), which arrived within a matter of minutes. When the canine alerted to the presence of narcotics in the vehicle, the officers searched the vehicle. In the rear compartment of the SUV, the officers found a black backpack containing approximately ten pounds of a white crystalline substance later confirmed to be methamphetamine. Tr. at 78–80.

## **DISCUSSION**

Wolfgramm, Pohahau, and Laulea challenge the traffic stop and the subsequent search of Wolfgramm's SUV as an unreasonable search and seizure in violation of the Fourth Amendment. Because there was probable cause to search the vehicle and the black backpack in it, the motion to suppress is denied.

"The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." *California v. Acevedo,* 500 U.S. 565, 580 (1991). "Probable cause exists where the facts and circumstances within an officer's knowledge and of which he had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed, and that evidence bearing on that offense will be found in the place to be searched." *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 369 (2009) (internal quotation marks, brackets and citations omitted); *see United States v.*

*Buckner*, 179 F.3d 834, 837 (9th Cir. 1999) ("'Probable cause exists when, under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime.'" (quoting *United States v. Garza*, 980 F.2d 546, 550 (9th Cir. 1992)) (alteration in original)).

Probable cause existed to search the gold-colored SUV and the black backpack in it. The DEA task force team had conducted prior controlled methamphetamine transactions between the CS, Wolfgramm, and Pohahau. Specifically, in August 2013, the same CS worked with SA Rumschlag and the DEA task force team to complete a controlled, ten-pound drug transaction with Wolfgramm and Pohahau. In that transaction,

> [t]he confidential source met up with Mr. Pohahau and Mr. Wolfgramm. Mr. Pohahau put a backpack inside the confidential source's vehicle. . . . [T]he backpack [was searched thereafter], and there was suspected crystal methamphetamine in there, approximately 10 pounds, which was ultimately sent to the -- the DEA lab for testing.

Tr. at 24. Thus, when the same CS set up a second controlled purchase of methamphetamine from the same individuals just weeks later, the task force was reasonably and justifiably confident that Wolfgramm and Pohahau would follow through with the delivery of methamphetamine to the CS, and that the delivery could well involve a backpack. The Court finds the testimony of SA Rumschlag credible, based in part on his demeanor, manner, directness, word selection, and

delivery, insofar as it established what the task force knew and the previous experience that the task force had with the CS, Wolfgramm, and Pohahau.

Additionally, the task force had probable cause based on the September 3 meeting between the CS, Wolfgramm and Pohahau, the September 4 telephone conversations between the same individuals, and the subsequent meeting planned for September 4. On September 3, 2013, Wolfgramm and Pohahau met with the CS and tried to enlist the CS's assistance in distributing another ten pounds of methamphetamine. The CS stated at that point that he did not want to receive the methamphetamine but would contact Wolfgramm and Pohahau the next day, apparently in an effort to permit law enforcement to establish appropriate surveillance. The next day, September 4, with task force members recording and listening to every word, the CS, in fact, contacted Wolfgramm and Pohahau and arranged for a meeting at Wahoo's Fish Tacos on Ward Avenue. Surveillance teams then observed Pohahau travel to and enter Wolfgramm's residence with a black backpack, also carrying it out of the residence with him when he, together with Wolfgramm and Laulea, departed in the SUV to meet up with the CS.

Task force officers followed the SUV as it traveled approximately 20 miles from Mililani to the area on Ward Avenue where Wolfgramm and Pohahau had agreed to meet the CS. At that point, considering the totality of the circumstances, the task force team members, including SA Rumschlag and Officer Vierra, had

8

probable cause to believe that there was methamphetamine in a backpack in the SUV that Wolfgramm, Pohahau, and Laulea planned to deliver to the CS at the previously designated meeting place. There was probable cause that the methamphetamine was in a backpack in the vehicle, given the previously completed transaction a few weeks earlier where Wolfgramm and Pohahau delivered ten pounds of methamphetamine to the CS in a backpack, the meeting on September 3, the conversations on September 4, and the observations of Pohahau carrying a backpack into the SUV as the defendants left Wolfgramm's residence on the morning of September 4 to meet with the CS.

    Defendants have offered nothing to question, much less refute, the information provided by the CS to the task force team regarding the August transaction, the circumstances surrounding the August transaction itself, including defendant Wolfgramm and Pohahau's involvement therein, the meeting on September 3, or the recorded telephone calls on September 4. Further, based in part on his demeanor, means of access, manner, and candor, the Court finds Officer Vierra's testimony credible that he and Officer Miyatake were briefed on the morning of September 4 regarding the previous transactions with Wolfgramm and Pohahau, and that they received radio and/or telephone communications later that day from task force members indicating that Wolfgramm, Pohahau, and a third individual (Laulea) were in a gold-colored SUV en route to the Ward Avenue

9

meeting place with the CS in order to deliver ten pounds of methamphetamine that was likely kept in a black backpack. These salient facts evidence probable cause.

Even if Officers Vierra and Miyatake were not privy to all of the details of the planned meeting on Ward Avenue, SA Rumschlag, the task force team leader, certainly was. "Where one officer knows facts constituting reasonable suspicion or probable cause (sufficient to justify action under an exception to the warrant requirement), and he communicates an appropriate order or request, another officer may conduct a warrantless stop, search, or arrest without violating the Fourth Amendment." *United States v. Ramirez*, 473 F.3d 1026, 1037 (9th Cir. 2007). All of the information discussed above regarding the previous transactions, the black backpack, the September 3 meeting, the plans for the September 4 meeting, and the defendants movements on September 4, was either personally observed by or communicated to SA Rumschlag. In turn, SA Rumschlag, as head of the task force, directed that Officer Vierra and Officer Miyatake stop the gold-colored SUV operated by Wolfgramm to seize the methamphetamine believed to be in a backpack in the vehicle. The officers were fully briefed on the morning of September 4 and understood the purpose of the vehicle stop if they were directed to initiate one.

In short, the officers had probable cause to stop the vehicle, perform a canine sniff to confirm the presence of narcotics, and search the vehicle for the black

backpack, based on the communications from and between team members. *Id.* The stop and search was reasonable under the Fourth Amendment.[1] *Acevedo*, 500 U.S. at 580.

Even if there was no probable cause, the officers, at a minimum, had reasonable suspicion to justify the stop and search. "Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." *Alabama v. White*, 496 U.S. 325, 330 (1990). "Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the 'totality of the circumstances—the whole picture,' that must be taken into account when evaluating whether there is reasonable suspicion." *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

---

[1] At the evidentiary hearing, defendants argued that the officers' failure to ultimately issue a speeding citation, or the procedure used by the officers in determining that Wolfgramm was speeding, somehow instructs that there was a Fourth Amendment violation. The Court disagrees. Though the Court will not speculate as to the reasons behind the task force's moving violation plans, the Fourth Amendment does not require evidence of such a violation under the circumstances presented here. In other words, the task force had probable cause to stop and search the vehicle without any traffic violation at all, based on the information in the possession of the task force at the time.

Officers Vierra and Miyatake at least had reasonable suspicion to make an investigatory stop of Wolfgramm's SUV and perform a canine sniff of the vehicle:

> [A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot. While "reasonable suspicion" is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop. The officer must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity.

*Illinois v. Wardlow*, 528 U.S. 119, 123–24 (2000) (internal citations and quotation marks omitted). "The requirement of *particularized* suspicion encompasses two elements. First, the assessment must be based upon the totality of the circumstances. Second, that assessment must arouse a reasonable suspicion that the *particular person* being stopped has committed or is about to commit a crime." *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (internal citations omitted). As noted above, the officers knew that Wolfgramm and Pohahau had previously delivered methamphetamine to the CS. They also knew that Wolfgramm and Pohahau had arranged to meet with the CS near Ward Avenue to again deliver methamphetamine to the CS. They knew that Wolfgramm was driving the gold-colored SUV and tracked it as it traveled from Mililani to the Ward Avenue area, in the neighborhood of the agreed place to meet the CS. All of this information was far more than enough to provide reasonable suspicion for the

officers to make an investigatory stop of the gold-colored SUV driven by Wolfgramm, have the canine unit sniff the vehicle after visually identifying a black backpack in the rear, and then search the backpack once the dog alerted.

## CONCLUSION

The motion to suppress is DENIED.

IT IS SO ORDERED.

DATED: October 10, 2014 at Honolulu, Hawai'i.



Derrick K. Watson
United States District Judge

---

United States v. Wolfgramm, et al.; CR 13-00877 DKW; ORDER DENYING DEFENDANT WOLGRAMM'S MOTION TO SUPPRESS EVIDENCE